Case No. 21-5200 Nancy Guimena-Huisha-Huisha and her minor child, et al. v. Alejandro N. Mayorkas, Secretary of Homeland Security, in his official capacity, et al., ad valens. Ms. Swingle, for the ad valens. Mr. Gallant, for the appellees. Good morning, counsel. Ms. Swingle. Thank you, Your Honor. Sharon Swingle, for the Department of Justice, representing the defendant's appellants in this case. In issuing the Title 42 rule and order, CDC applied its scientific expertise to address a once-in-a-century, highly dynamic public health emergency involving emergent variants of COVID-19, rising transmission rates, and strained healthcare resources, in particular at remote areas near the southwest border. The challenge CDC order responds to the serious danger of the transmission of COVID-19 that arises for noncitizens who enter the United States without valid travel documents and, as a result, would normally be held in congregate settings pending their processing under the immigration laws. Under the Title 42 order, those noncitizens can be rapidly screened and then quickly expelled, substantially reducing the risk of transmission. If those noncitizens were required to be processed under Title 8, they would have to be transported to border patrol stations or held at ports of entry, facilities that are not designed or equipped to quarantine, isolate, or treat COVID-positive individuals, and they would be held for lengthy periods in these crowded and overcapacity facilities, posing a substantial risk of the spread of COVID-19 to other noncitizens, CBP officials, and the public at large. Two different panels of this court have already concluded, in granting stays of preliminary injunctions in this case and PJES, that the government is likely to succeed on the merits, and we similarly ask this court to vacate the district court's preliminary injunction, which was premised on an erroneously cramped view of the CDC's authority under Section 265. Ms. Swingle, you started out by mentioning or leading with the CDC's expertise, health expertise, and as you know, the plaintiffs have, to a somewhat small degree in their briefing, suggested that this decision was not really made based on any health concerns. Now, the arbitrary and capricious challenge that the plaintiffs brought to this order was not briefed on this appeal, but it was raised in their complaint. And so, I'd be grateful if you could address some concerns I have about whether this order was arbitrary and capricious, as the plaintiffs allege in their complaint, and some factors that seem to inform my concern, that do inform my concern, are as follows. One is that the statute refers to introducing a disease, but COVID is unfortunately quite introduced into the United States by this point in time. In particular, with regard to Mexico and Canada, which the order applies to, I don't know of anything in the record suggesting that COVID is more prevalent in Mexico or Canada than it is in the United States. In addition to that, the order only covers about 0.1% of people who cross the Canadian or Mexican border. I don't know of anything in the record suggesting that those 0.1% of border crossers are more likely to have COVID than the other 99.9%. In addition, the order applies only to Mexico and Canada. I don't know of anything in the record suggesting that those two countries have especially high prevalence of COVID relative to other countries that are not covered by the CDC's order. And then I guess I would add to that sort of perhaps less specific, but more general concern, maybe concern is the wrong word, but factor in the arbitrary and capricious analysis, that the plaintiffs have alleged and cited some reports that there are no experts in the CDC who actually think any health concerns justify this order, that the order was forced on the CDC's director over the objections of those career CDC people who refused to sign the order. And I would suggest maybe if the order was justified, was not arbitrary and capricious in March of 2020 when there was so much uncertainty. It's now January of 2022. And we've heard from Dr. Fauci, who in many ways, in many instances, the administration has pointed to as an expert deserving of trust. And he has said directly that expelling immigrants is not a solution to COVID-19. Now, I'm not suggesting that we should defer to Dr. Fauci, but it seems that the administration has sometimes suggested that his guidance is worthy of deference. So with all those things in mind, can you explain to me why the plaintiffs were not correct when they said that this policy is arbitrary and capricious? So there's a lot there to unpack, and I hope you'll give me a chance to address it with all due steps. First, as your Honor's question, I think, made clear, the arbitrary and capricious claim that was brought by the plaintiffs was not the basis for the district court's preliminary injunction, and they have not argued that that should be a basis for this court to affirm that injunction as not being abuse of discretion on wholly alternative grounds. So I think it's not appropriately before the court. But I want to be also clear that the CDC has and continues to apply its public health expertise. And as recently as the August 2021 new order has again concluded that the order remains necessary as applied to members of family units and single adults who cross the border without valid travel documents. And the reason for that really goes to the circumstances in which those individuals would be held under normal immigration processing, which is to say, if they cross outside of ports of entry, they would be held in border patrol stations that are often rather small facilities, often, you know, largely over capacity, even in normal times, much less in these COVID times with restricted capacity in an effort to mitigate the spread of COVID. And those conditions are highly conducive to the spread of COVID-19 to non-citizens, to CBP officials, and the public at large. Now, to get to some of your specific questions, if I can start sort of where you ended with Dr. Fauci, I would encourage the court to listen to the specific Dr. Fauci interview that the plaintiffs cite multiple times in their brief. Seconds after the quote that they rely on, he was specifically asked if there was a medical necessity for the CDC's Title 42 order. And he said that he was not sufficiently aware of the circumstances to express a comment on that issue. So I think that it in no way undermines the CDC's judgment. And it's a judgment that has been made repeatedly across two political administrations. And as recently as the most recent re-review of the order at the end of November of this year, last year, that the order remains necessary to protect the public health. I think the fact that there is a higher prevalence in Mexico or Canada or a lower prevalence was not the basis for the order. I think the basis for the order is the spiking incidence, the continuing basis for the order is the spiking incidence of COVID. Most recently in August of the new Delta variant. And I obviously am not telling the court anything. It doesn't know that now the Omicron variant has also had an impact on the need for the order. Going to your question about, but I would add that the CDC did note that the non-citizens who are coming to the United States across the border were coming from countries that at that time had lower vaccination rates than within the United States. You mentioned the very small percentage of the individuals who cross the border who are subject to the order. That again is not surprising because those are the individuals who would be held in congregate settings at CBP border stations or ports of entry. For individuals who cross with valid travel documents, the process of entering is very quick. It does not involve any kind of confinement or holding in a closed setting that poses the kind of risks of transmission that are really designed to be responded to by the CDC's order. And then finally going to your first question about how the CDC's expertise is implicated by its interpretation of introduction. The CDC determined and I think reasonably so that introduction can occur when somebody moves into the country in such a manner as to pose a risk of transmission of a communicable disease. And here an individual who crosses the border and walks five miles into the interior of the country who would then come into contact with other persons in a way that would risk transmission of COVID-19 is reasonably understood to be in the process of introduction. And I think that reflects CDC's application of its expertise about the way in which communicable diseases spread and the circumstances that give rise to the public health emergency that justified the order here. As I understand the basis of the order, though, the fact that somebody comes in and then might encounter other people, let's say, sometime afterwards, that can't be the basis for the order because that's true of all kinds of people who come over, who immigrate into the country. The entire rationale for the order, I think, has to be because otherwise it would be substantially under-inclusive. It has to be bound up in the congregate settings. It's all about the congregate settings because any other explanation that deals with COVID writ large just can't substantiate this order, I think you would agree with, and that's why the order is framed as it is. It has to do with the congregate settings, and the congregate settings are a product of the way that the government chooses to structure its affairs. Now, I'm not saying that there's practical alternatives. I don't mean to suggest that there's something that's just obviously there that should be done. I'm just saying that it's a consequence of the way that the government structures its handling of persons who come to the border without documentation and seek these forms of relief under Title VIII. Yes, I don't mean to suggest otherwise, Judge Srinivasan. I would just add that the extent that those congregate settings and the normal mechanism by which non-citizens would be processed when they are in the United States or enter the United States without valid travel documents poses the risk. I would just add that there is a risk that the government at risk attains both as individuals who can be turned away at the border and individuals who manage to evade the prohibition on entry by entering outside of ports of entry. When does introduction end? I think that's an interesting question, and I think it's one that is addressed in part in one of the final rules, the September 2020 final rule, which reflects that somebody who has been in the United States for longer than the incubation period and doesn't have symptoms or hasn't tested positive may have finished introducing himself into the United States. That's at 85 FEDREG 56445. But I don't think, you know, the challenged order applies to individuals who are apprehended or encountered at or near the border after either entering presenting themselves at a port of entry or entering, you know, outside of a port of entry. And I think the plaintiffs here have not brought any challenge that somehow it's being applied to people who have been apprehended far enough away from the border or a long enough period of time that they are no longer still in the process of being introduced. Thank you. Can I ask a question about the interrelationship between 265 and the title eight provisions that provide for a particular process, or at least an entitlement vis-a-vis asylum, the withholding of removal and the convention against torture? So the context against which we think about the interrelationship between those, because I think both sides treat with the interrelationship. And what you say is, well, 265 takes control because it deals with the specific context of the kind of emergency we're dealing with here. And so it supersedes, overrides, or carves out from what otherwise would be the case under title eight. And the other side says, no, that's kind of backwards. Actually, the specific provisions are the ones under title eight, and they carve out from what otherwise might be authority under 265. And so I'm trying to figure out how do we assess which side has it right in terms of which statutory regime governs over the other one to the extent that there's an interrelationship between the two and a need to harmonize them or figure out how they work together in this situation. And so the context against which we assess that question is informed by the fact that the title eight already accounts for inadmissibility for individuals who have communicable diseases and says that if you have a communicable disease, that's a ground for inadmissibility. And so you don't otherwise qualify for admission into the United States. But it's specifically, Congress specifically said, even as to that ground of inadmissibility for somebody who actually has a communicable disease, and it's a communicable disease of public interest. I can't remember the precise wording, but I think the language of public significance maybe is what it says. But the title eight entitlement still governs. And so notwithstanding that somebody has a communicable disease of public significance, they still have the entitlement to see through the processes under title eight to seek asylum relief under withholding or convention against torture. So if that's the balance that Congress has already struck with respect to somebody who has a communicable disease and is inadmissible to the United States by virtue of that, then that seems to me to have some salience as we're trying to figure out how 265 interrelates with the title eight authorities. Absolutely, Your Honor. I would first point out that, of course, the district court did not ground its preliminary injunction on that argument. It didn't reach it, didn't rule on it. So it would be in the government's view. That's not necessarily to say we would do it without sending it back, but it's at least to say that it's a possibility. Agreed, Your Honor. I would first point out that even at the time that the predecessor statute to section 265 was first enacted in 1893, communicable diseases were already at that point a ground of inadmissibility under the immigration laws. But Congress clearly meant to displace that general rule and to grant a broader authority to, at that time, the president, to suspend the introduction of persons in the face of a significant public health emergency of the sort that is the basis for invoking section 265. So I think you can see in that that Congress understood, even at the time that section 265's predecessor would be focused on a very specific, rare set of circumstances. And I think under normal principles of the specific governing the general, that reflects a congressional intent for this different rule to apply in the unique circumstances that we are facing in this. If I can just stop you for a second. That's true. But at that point in time, you didn't have the Title VIII humanitarian provisions that you have now, and you didn't have Congress having struck the balance in favor of those as against somebody who presents with a communicable disease. So I agree that the Congress, in enacting the Convention Against Torture and the Refugee Protocol, did set out generally applicable rules for immigrants generally. I think our view is that section 265 nevertheless constitutes the more specific rule of decision. And I think to the extent that there is conflict, you can look to the text of section 265 and its context and drafting history. It was originally entitled the Suspension of Immigration. The specific provisions of the statute envision that initially the president, now the CDC, will have the authority to suspend the right to introduce. That right was one that was understood to be applicable, in our view, under the immigration laws. And the suspension of immigration necessarily encompasses the authority to suspend what would otherwise be the operation of the immigration laws in the face of this kind of unique public health emergency. Is there also, I guess, an argument that section 265 says basically Congress is giving the Surgeon General the authority where there is serious danger of the introduction of such disease into the United States? Is that, I guess, fodder for your argument that this is the specific trumping the general because nowhere in those other immigration statutes is there kind of a, I guess, an acknowledgment that there is a serious danger of introducing the communicable disease into the United States? Yes, Your Honor. That is our view. To the extent there is anything in the immigration laws relating to transmission of communicable diseases, it's in the grounds of ineligibility that were in place already at the time that section 265 was enacted and was clearly intended to supplant. And to the extent we're looking at sort of generally applicable entitlements to apply for asylum or relief under the Convention Against Torture, those have no reference to the kind of significant public health emergency at issue here. I do want to be clear, however, that in its application of the Title 42 order, the CBP officials are providing an opportunity for some humanitarian relief for noncitizens who express fear of torture upon return to the country that is the country of destination. They are being referred to USCIS for further screening. But you're not taking the view that that complies with Title 8, right? You're just saying that that has opportunities. Otherwise, we wouldn't even have this dispute if it actually is. Exactly, Your Honor. Can I ask you, does the government on this set of issues – I didn't read anywhere in the brief that the government draws any distinction as among the three forms of Title 8 relief that we're talking about, i.e. asylum, withholding of removal, and Convention Against Torture, that they stand or fall together. Either the plaintiffs are right in their alternative argument. There's an entitlement to pursue that Title 8 process notwithstanding 265 as to all three, or you're right that that entitlement that otherwise would exist is nonexistent in the face of an assertion of 265 authority. That's correct, Your Honor. We have not distinguished between the three forms of relief. We think in these circumstances where Section 265 has been invoked, all of them are displaced. Can I ask you one other question? It's on a little bit of a different axis. So getting back to the point that the focal point of the order is the circumstances in congregate settings, and that's really the basis against which the order was promulgated and then renewed. What's the status of unaccompanied minors vis-a-vis congregate settings? Because I know that unaccompanied minors aren't covered by the order, and the question I have in my mind is, in terms of the rationale for not including, are they meaningfully differently situated vis-a-vis congregate settings? It's not my understanding that they avoid congregate settings altogether. It may be the case that they're, as a rough average, they're there for a lesser amount of time. I don't know for sure, but I'm just curious to get your explanation as to why unaccompanied minors are carved out vis-a-vis the concerns about congregate settings that underlie the order. Absolutely, Your Honor. So I think unaccompanied minors are different in a number of pretty critical ways. Obviously, for an initial period of time upon their encounter, they are going to be held in a congregate setting pending transfer. They would be held, as with other distinct demographics, separately from other members of family units, for example, or single adults. There are a much smaller number of unaccompanied minors who are encountered than members of family units or single adults in particular, so the risk of overcrowding is, in some respects, lessened as to that population. But I think most importantly, they can be transferred to the Office of Refugee Resettlement, which has robust capacity for holding those minors, and they can be transferred quickly into those facilities, which have testing available. They have quarantine and isolation available. They can provide vaccination for the minors, and then they can ensure that during that period in which they need to be quarantined or isolated, they are actually complying with mitigation protocols. For members of family units, there is not the comparable ability to do that kind of monitored quarantining or isolation testing treatment in a way that exists for the unaccompanied minors. But if I'm understanding it correctly, that happens after leaving the initial congregate setting. Because if the order was based on what happens outside of the congregate setting, then there's lots of people who are coming over every day who raise exactly the same kinds of concerns but aren't covered by the order. So the order has to be justified by what happens in the initial congregate setting. And so the distinction between unaccompanied minors and members of family units would need to be grounded in a difference vis-a-vis that initial placement in a congregate setting before the unaccompanied minors go to an RR facility and have the kinds of benefits that you've listed. Principally, Your Honor, but I want to respond in a couple of ways. First, in addition to the risk of congregate settings, there is this question about the strain on local regional health care resources. In the CBP facilities, in the ports of entry, there are limited or no medical resources available. And so for individuals who are sick, who need treatment, who need to be tested, particularly PCR testing, they need to be transported to local health care facilities for that treatment and testing. And so that itself both risks the spread of COVID, but in particular, in areas where there are limited resources, that can be a real strain on the resources of the health care institutions at a time when they are already strained because of rising COVID rates in the local communities. So I think that's one distinction that we see. The second, you know, yes, absolutely one critical risk is of the spread in the congregate settings. But one of the concerns about spread in congregate settings is about the potential spread into a local community. And for members of family units, because of the Flores settlement, there are limits on how long members of family units can be held in detention. And so what's happening is that if they are being processed under Title VIII, after being held in this congregate setting, which is posing this risk of spread of COVID, they are then released on discretionary parole into the community. And the concern is that people who either were previously infected upon entering the country, or who have then become infected in that congregate setting, are then being released into the community, where there is limited ability to quarantine, isolate, monitor the compliance. But that's true, but that's just true of all kinds of people who come across the border every minute of every hour of every day. They are released into the community. So there has to be... I would respectfully disagree, Your Honor, because what I'm saying is that the risk is caused by the release after the holding in the congregate setting. Right, so that's the congregate setting that creates the problem. So everything comes back to the basis of the order, which is bound up in the congregate, initial congregate setting. Yes, although I think the risk is not limited sort of temporally to that period. Yeah, exactly. I take that point that there's subsequent risks that emerge from the initial congregate setting, but the differentiator is the congregate setting. At least that's the entire gravamen of the order, as I understand it. That's correct, Your Honor. And I want to be clear for the court, you know, the goal for the government is to eventually work back to orderly, normal immigration processing. And notwithstanding the very real resource constraints that DHS and ICE have been faced with in light of limited congressional expropriations, they have taken significant steps in recent months, recent years, to increase capacity and improve processing. DHS has stood up numerous emergency facilities and retrofitted existing ones, and in part that has allowed for greater capacity to process unaccompanied children and now family members. ICE has transitioned existing facilities, and DHS is sometimes using private contractors to build out facilities. And they, of course, have previously set up programs for special exceptions for non-citizens, which have allowed collectively some 29,000 people to come in as exceptions to the order. The goal is to return to a world in which everyone is processed under Title VIII, but we are just not there yet. On that point, you also mentioned that for unaccompanied minors, the numbers are less than the numbers for the family units. Much, much less, yes. And I'm just wondering, how much less is it if we only talk about the number of individuals in family units who are, in fact, processed under Title XLII rather than Title VIII? Because as I understand the record, at least for one relevant period, 86% of individuals in family units were, in fact, given the Title VIII process because of the refusal of other countries to accept people who hadn't gone through the Title VIII process. And so I'm wondering what the comparison is between unaccompanied minors and then the number of people in family units who actually go through the Title IV-II process. Certainly, Your Honor. The latest numbers are not in the record before the court, but they are available online. DHS does keep those. And I would just note that although at the time the opening brief was filed, the most recent month had been a sort of a unique low in the percentage of family unit members who were being expelled under Title XLII. That number has been significantly higher in subsequent months and has varied between over 11,000 individuals in November 2022 and over 17,000 individuals in August and September of 2022, and up to a high of 31% of members of family units in October 2021. So the 14% is not a number that has remained static. I don't have the numbers for unaccompanied minors directly in front of me, but my understanding is that they are a much smaller number compared to the number of family member units who have been expelled. And of course, I would just add, if I might, that the district court's reasoning here, although it was applied in a class action brought only by members of family units, would be wholly applicable to any category of non-citizens expelled under the order. And I would just mention that the numbers for single adults have remained staggeringly high, and the idea that the government would be able to process what now is probably close to 100,000 non-citizens monthly and hold those individuals in congregate settings is obviously an alarming specter from the public health perspective. There is some discussion in the record of prior CDC regulations in 2017 related to Ebola and other communicable diseases. Do any of those prior regulations purport to give the CDC the authority to suspend immigration laws and expel persons, either explicitly or did it happen? I don't believe so, Your Honor. I would note that those regulations were not issued under Section 265. I believe the only time Section 265 has previously been invoked to suspend introduction of persons was in response to the epidemic coming from China and the Philippines in 1929, which did not, by its plain terms, provide for expulsion. But, of course, in the government's view, suspending the introduction of persons from a country necessarily encompasses the authority to expel somebody who comes in in contravention of that prohibition. In the same way, federal law prohibits, for example, the unauthorized entry onto the White House grounds, and surely the fact that that also provides for criminal punishment, a fine, or imprisonment of somebody who violates that prohibition doesn't disable the Secret Service from apprehending somebody who has managed to hop the fence and turning them around again. But it doesn't mean that they have the authority to, for example, shoot and kill them on sight, right? I mean, because they can stop the introduction doesn't mean that they can stop the introduction any way they see please. Agreed, Your Honor. Our point is only that the power to suspend introduction or prohibit introduction is most normally understood to include the power to expel somebody, push out somebody who has entered notwithstanding that prohibition. What are we to do with the, I mean, I'd be, I'm inclined to be very sympathetic to your position, but we have Supreme Court authority that says that when, you know, an agency is taking, you know, unprecedented, you know, action or exercising some unprecedented power, that we are to look askance at that. And so what are we to do with that authority? of a sort, you know, never seen in our lifetimes. And I think with all due respect, this is akin to, for example, the application of the Medicare Medicaid rules to require vaccination that the Supreme Court has just recently opined on. And that was the subject of our 28-J response letter last evening. You know, this is a unique and extraordinary circumstance, and it is hardly surprising that the government would invoke a quite extraordinary power that was intended to be a quite extraordinary power to bring, has brought that to bear to respond to try and protect the public health. Well, of course, your friends on the other side say it's more akin to the OSHA rule that the court struck down, right? And we think that's just simply not correct. This is not a circumstance in which we are claiming the power to regulate some vast array of economic activity. This is not a restriction that applies even to U.S. persons, and it is carefully circumscribed and I think, you know, really tailored to the precise risk that happens when non-citizens are being held in these congregate settings in a manner that poses really a substantial risk of the spread of this terrible disease. This is also a category of persons as to whom, just to get back to Title VIII, the record materials indicate, and I think just what the Title VIII provisions are about, are some harrowing conditions that are faced by people who are turned away. And I think you would acknowledge that aspect of this, such that the 265 authority, when it's asserted in this context, will mean that individuals who otherwise couldn't be sent back to a particular country because they will be tortured there will be. Certainly, Your Honor, we are aware of and deplore the quite horrific circumstances that non-citizens are in in some of the countries that are at issue here. I would take issue with the fact that somebody who expresses a fear of torture certainly is being referred appropriately to USCIS for a possible exception. And, you know, we do have humanitarian exceptions to the Title 42 order. We have previously used that to try and bring in particularly vulnerable people. And I would just note that the August 2021 order, again, contains a new exception for programs if they can be developed to safely bring people to ports of entry consistent with public health needs to try and apply for the kind of relief Your Honor is seeking. I would want the court to use that information, I guess, in your favor. Is it just information that we use in thinking about irreparable harm or balance of equities? Or does it go to likelihood of success on the merits? So I don't think it goes to likelihood of success on the merits as to the statutory authority question. That was the basis for the district court's preliminary injunction. And I also don't think it goes to likelihood of success on the merits at this stage of the litigation where neither the plaintiffs nor the defendants have briefed that as an alternate basis for affirming the preliminary injunction. I do think it is relevant at the balancing of equities stage, of course, in the government's view, because the likelihood of success on the merits is a necessary factor to be established to be a basis for preliminary injunction in the government's view that the court doesn't actually need to reach the balancing of equities. But if we disagree with you about likelihood of success on the merits and we have to reach the balance of equities, I wonder if we should consider the sort of self-contradiction between the Department of Justice's briefing in this case and the Department of Justice's current cert petition with regard to remain in Mexico, where the cert petition says aliens sent to Mexico face persecution, abuse, and other harms. The cert petition says there's, quote, extreme violence perpetrated by criminal organizations. The cert petition says sending asylum seekers to Mexico doesn't, quote, align with the administration's values. And as you know, and as I think you don't contest, the plaintiffs in this case describe how the plaintiffs will be pushed across bridges at predictable times and locations where cartels lie in wait. They tell the story of a mother who was expelled and then armed men grabbed her and raped her multiple times while she begged them not to harm her daughter. And they say that's just one example out of 3,000 or so kidnappings and other attacks. So what are we supposed to do with this, what I would describe as self-contradiction between cert petition you filed in remain in Mexico and your argument with regard to the balance of equities in this case? So, Your Honor, I don't believe there is contradiction there. We have not contested that migrants have been subject to extremely harrowing conditions in Mexico or elsewhere. And certainly we deplore the horrific treatment of those individuals by gangsters and criminals and violent persons. I appreciate that. And I know that you're not denying it. You're conceding that that's the reality they face. But you seem in this case to be downplaying it relative to what you describe as the risk from COVID, which, as I mentioned, covers only 0.1% of people who cross the border. I understand that they're in concrete settings, but this isn't March 2020. We have widespread available effective vaccines. We also have a whole host of testing that wasn't as widely available and were treatments as well. So I'm not asking whether you agree that these terrible risks exist for these migrants. I know you agree that they exist. I'm asking you to sort of square how much you emphasize them relative to other values and concerns in the remain in Mexico litigation and how much you seem to devalue them with regard to COVID concerns in this litigation. So with all due respect, Your Honor, I simply don't agree. Obviously, the government's goal is to get back to a state of orderly immigration processing for everyone. But currently in CDC's view, the public health realities don't permit that. And just to respond to a couple of specific points in your question, for example, yes, vaccines are more available. But vaccinating somebody upon encounter does nothing to reduce the risk that that person may spread COVID in a congregate setting in the days after vaccination when the vaccine has not yet become effective. Testing is, you know, certainly more widespread now. And I don't want to downplay its efficacy. It is one of the mitigation measures that Ms. Swingle, if I may interrupt, I didn't mean that it would be effective to vaccinate the migrants. I meant that the American citizens, those who wish to be protected through vaccination, have had that option for almost a year now. The administration has said that those who are vaccinated will have a good year, something like a good summer, a good year ahead. The administration has said that the unvaccinated are at great risk and that, you know, it's sort of criticized them for making that choice. But I'm saying in a country where everyone who wants to be vaccinated has been vaccinated and in an era where the vaccines are as effective as they are, how is it that you devalue these risks to migrants that you seem to emphasize so much and you remain a Mexico litigation? So if I may, Your Honor, I think, yes, many CBP officials are now vaccinated who were not vaccinated in March 2020. We certainly are extremely happy that there is a vaccination available and widespread, more widespread through the United States than it was at the outset of these challenged rules and orders. On the other hand, you know, we have new variants. Even as of August 2021, the Delta variant was a game changer and can lead to breakthrough infections even in vaccinated people. That doesn't mean that non-citizens are vaccinated. You know, there is a change in the calculus of risk, and I think the CDC has responded, you know, effectively and timely to changed risk by, for example, accepting unaccompanied children as the facts from the ground have changed. But in the CDC's judgment, the need for this order remains in place, notwithstanding the changes that have happened. Is there any affidavit in the record from an expert at CDC attesting to what you just said? Maybe there is, but I'm asking. No, Your Honor, but I would also just point out that, you know, no record has been put forward yet. This was all decided at the preliminary injunction stage. I would just add, you know, I think this all highlights the need why the CDC should be making the public health determinations in the first instance. I don't need to tell the court that this is an extremely dynamic set of circumstances. You know, at the time of the August 2021 order, we had the Delta variant, which, you know, was a very significant game changer in terms of sort of anticipated plans for federal reopening and other things. You know, just in the past few weeks, we have the Omicron variant. These all emphasize why the CDC, rather than, you know, a judge issuing a preliminary injunction, should be making decisions about what the public health requires. There is something quite extraordinary. Go ahead, Judge Walker. No, please. I was going to go back to the likelihood of success in the merits. So, please, Chief Judge. I'm on likelihood of success on the merits, too. Okay. So, there is something interesting about and anomalous about this exercise of authority by the CDC, because even if, as a general matter, I certainly don't take issue with the proposition that the CDC director would be acting in the interest of public health and is doing so, is intending to do so here, for sure. And that would be true in the normal instance in which 265 would apply to an across-the-board kind of mechanism. What makes this case something different in terms of its architecture is that it only applies in the context of border crossings, and the order draws the kinds of distinctions that just make immigration policy, because it carves out certain categories. It carves in certain categories, and it just – it can't help but be – it invokes the assistance, totally understandably and necessarily, of DHS and CBP, but it can't help but be a document that ends up being an immigration policy resolution that is being done under the auspices of the CDC. And with all due respect, Judge Srinivasan, I think that is precisely what Congress intended in enacting this statute. In 1893, in the face of a cholera epidemic, and I might add a cholera epidemic that had already started in the United States, that had already been introduced to the United States, that the prior year the government had taken action to try and stop, Congress specifically intended to confer this authority to suspend all immigration, as well as all nonimmigrant travel, or some subset of those people, precisely in order to stop this kind of increased transmission of a disease, increased risk of a transmission of a disease. Right, but I think all nonimmigrant travel factors into this, because something that would apply to everybody coming here – of course, it's going to overlap with immigration. I completely take that point. It's necessarily bound up in it. But when the document deals specifically with a population of undocumented immigrants and draws distinctions among undocumented immigrants, it starts to sound like exactly the type of immigration debates that have been vexing immigration policymakers for a long time. Well, you know, Your Honor, I think it's really quite instructive to look at the legislative history, and in particular, the drafting history of what became Section 7 of the 1893 Act, because in that debate over the statute and in the various iterations of the bill that were considered and rejected in favor of this one, there was widespread understanding about precisely what Your Honor is discussing, which is that the authority conveyed by this statute would allow the President to choose subsets of individuals crossing the border to suspend the introduction of, prohibit the introduction of, precisely in order to reflect judgments about the difference in consequence and impact of bringing, for example, immigrants versus travelers who came for tourism or pleasure purposes, immigrants versus U.S. citizens or U.S. persons. So I think it envisioned – you know, I appreciate that immigration policy gets kind of caught up in this, but I think that is by virtue of the sort of basic set of circumstances that this statute is intended to address, which is the fear of significant danger of transmission of a disease over the border coming from people crossing the border. One last question along these lines, and then I want to make sure my colleagues don't have additional questions for you, which is, you're not going to buy this premise, but I'm just going to ask you to buy it just for purposes of understanding the architecture of the case, and that is that among the various grounds that the plaintiffs have asserted before us, not writ large in the case, but before us, am I right in understanding that the one that would be the narrowest limitation on the scope of the CDC's authority under Section 265 would be the Title VIII ground as opposed to either the ground on which the district court rested, which is that the power-to-stop introduction just doesn't encompass expulsions at all, or the notion that the statute was directed at either common carriers or third parties, and you can glean that from the use of the locution of the introduction. The Title VIII one is narrower in scope, not narrow in scope in a way that you would accept, but narrower in scope than those other two grounds. I do think in that sense it's probably technically narrower in scope because, of course, there are other arguments that would leave Section 265 essentially insignificant or really a nullity. I would say that as a practical matter, the ramifications of that would be substantial because it would require offering processes, procedures for any individual subject, potentially subject to the order, to invoke rights or protections under the asylum laws or the CAT beyond what is being done now in a way that effectively would, I think, eviscerate the authority of the government to apply the order in the way that it's actually protective of public health. Yes, certainly with respect to the order, I completely take that point with respect to the scope of 265 writ large. Yes, I agree, Your Honor. Certainly the other arguments that this is only intended to be a regulation of common carriers or that I think the most extreme version of the argument that the government can issue a prohibition on entry but has no ability to enforce that except through criminal prosecution and fines, those would obviously be much more sweeping. If I could ask a question or two on the merit and likelihood of success, I think I'm with you on this statute not just applying to transportation, third-party providers, and also I think I'm with you on the statute didn't need to expressly give the executive the authority. To expel in order for the executive to be able to expel under this statute and even on some of the title eight questions. I think I might be with you. It seems odd to give an asylum process to someone who under a 265 order is guaranteed to not be able to get asylum, someone whose very presence is rendered illegal under 265. And then on the Convention Against Torture, as you mentioned, there may be some accommodations for that under the order as it exists. So what do I do if I think only on the right to withholding of removal is this order inconsistent with the statutory right to withholding of removal? What do I do then? So, again, Your Honor, I think we would urge, because those were not issues that the district court ruled on, if the court thought that that were a significant question, we think it ought to be sent back to the district court. I do think withholding of removal is somewhat different from the right to apply for asylum in the sense that it is a defense to removal, which is a process, a term of art under the immigration laws. And, of course, the individuals here are not being removed within the meaning of that term of art. They are simply being expelled. And I want to be clear, this is not actually an adverse immigration act. It has no adverse consequences under the immigration laws, unlike removal, which has some legal consequences for non-citizens. This is simply not that process. It's a wholly different thing. Can you spell that out a little bit for me? I think that may be the solution to this case from my perspective. The difference between expelling, as you're doing under this order, and removing in the sense that the statutory right to withholding of removal to a place where you'll be persecuted uses the term removal. Yes, so, and again, this has not been briefed, and so I'm bringing it a little bit here, and I want to not be inaccurate for the court. And certainly if this is something your honor would like supplemental briefing on, we would be happy to provide it. Withholding of removal is a defense to removal for somebody who would otherwise be subject to removal, either expedited removal or normal removal under Title VIII. And what is happening in the The government obtains some basic biographic information on them, just to check to make sure that they are not criminal aliens who would be subject to prosecution under the criminal laws. But to the extent that they are not, they are then simply transported to a port of entry and walked across the border, or if it's not possible to expel them to Mexico, flown to another country. But there is no adjudication made that would have any adverse consequences for them. The way it's documented in the government's systems is not something that has any negative legal ramifications for a non-citizen who subsequently attempts to enter the country or apply for relief or some type of right under the immigration laws. It's of no consequence, unlike removal, which may affect a statutory bar, for example, to a subsequent effort to enter the United States. And I'm, in some ways, because it wasn't briefed and it wasn't the basis of the district court decision, I'm flying a bit blind myself. So don't take this as a hostile question, but the right to removal to a country where you'll be persecuted seems to kind of make real a value that we have as a nation. So imagine that, you know, if there were a genocide in another country, we wouldn't put somebody who's currently on American soil back into that country if their group is the target of the genocide. And I'm not saying it only applies to genocide, but that would be like the most drastic example. So imagine that there was a genocide against a certain religion in Mexico and someone of that religion crosses the border and encounters Border Patrol 10 minutes later. Are you saying that the statutory right to withholding removal would not prevent the United States from taking that person from American soil and putting them back in Mexico where, in my hypothetical, there's a genocide and their group is the target of the genocide? So two things, Your Honor. First, to the extent that that person expresses a fear of mistreatment, a fear of torture upon expulsion, that person is going to be referred to USCIS for relief. So the order contemplates application of humanitarian exceptions to expulsion. But, you know, in our view, the order is not removal. It is sort of operating apart and entirely separate from the operation of the immigration laws. And so no statutory defenses to removal being effectuated under Title VIII do not apply. I was just going to correct something I said earlier. I misspoke when I said every American can be vaccinated. It would be every American over five, at least unless they have health conditions that prevent it. I just wanted to correct my misstatement. So, as I understand your response, as a matter of legal authority, the hypothetical that was presented by Judge Walker, the answer would be yes, the 265 authority would allow for sending that person back in the face of the circumstances that he outlines. There may be some minimal process that even you acknowledge, I think you have to, is not the normal Title VIII process for someone who's seeking withholding or relief or protection under the Convention Against Torture. That may exist as a matter of grace under the order, but as a matter of the government's understanding of the 265 authority, it does completely supersede the withholding of removal protection that otherwise would exist. That is correct, Your Honor. Although, as I understand the withholding of removal, that is a statutory defense to removal under Title VIII, which is obviously not, in our view, what's happening here. And do you see a distinction between withholding removal and Convention Against Torture? I'm not aware that there's any distinction between those, other than I know that the order carves out this non-Title VIII compliant minimalist process by which somebody can affirmatively exclaim that they would be subjected to torture if they were sent back. I understand that that's a possibility and it's happened in a handful of instances, but in terms of the relationship between Convention Against Torture and withholding of removal, I didn't understand there to be a distinction between those two, but maybe there is. We have not drawn a distinction for purposes of this humanitarian exception under 265. You're correct, Your Honor. In our view, the 265 expulsion authority is independent from Title VIII and supplants what would otherwise apply under Title VIII, including any Title VIII defenses to removal. Let me just anticipate something that the plaintiffs are going to say. They're going to say we shouldn't ask for supplemental briefing, or they're going to say we shouldn't send this back to the district court on this Title VIII question. If the court's inclined to disagree with the district court on what it did but did not decide the Title VIII question, they're going to say don't send it back to the district court because that would just put these plaintiffs through months and months more of delay. What's your response to that? We don't disagree that the court can reach that question. We do think it's somewhat anomalous to say the district court didn't abuse its discretion because it could have but didn't rely on wholly independent grounds, but it's certainly within the court's authority to reach that. We just think that they're wrong on the Title VIII question. And if I can be precise about one thing, Judge Walker, in offering supplemental briefing, we're certainly happy to offer supplemental briefing on Title VIII writ large. But I think the precise issue I was suggesting hadn't been briefed really at all is whether if one were to look at Title VIII defenses to removal or particular rights available under Title VIII, whether the defense for withholding a removal might be differently situated, for example, than the right to apply for asylum, which is not a defense to removal but is a freestanding Title VIII provision. Thank you, Ms. Winkle. If my colleagues have no further questions for you at this time, we'll give you some time for rebuttal, but we'll hear from the plaintiffs now. Mr. Geller? Good morning, Your Honors. May it please the court, legal learn from the ACLU for Plaintiffs Appellees. I want to just jump into the conversation you've just been having about reconciling Title VIII with 265. Just to clear up a few points, withholding applies regardless of whether you're in the immigration system, because I gather that's what my friend's argument is, that that's clear cut. The Refugee Convention says, to quote, it is Expeller, return, refowler in any manner whatsoever. Our domestic law makes it clear you can apply. And the reason is sort of common sense, and this is laid out in the UNHCR brief and the IRAP amicus brief, is otherwise a sovereign nation could just relabel their laws and then send anybody back who they want to to persecution. So it can't be that it's limited to the immigration laws. That still leaves reconciling with 265, but I just wanted to clear up that very specific point. And on asylum, of course, you have a statutory right to apply. You have no statutory right ultimately to be granted it. Withholding and CAT are mandatory, but ultimately the government's not raising a distinction. I think that's because they need to provide these protections. Putting aside 265, they do need to provide these protections. And just one other note about CAT. As Judge Srinivasan has said, it's not a legal answer for the government, because even if they were providing for CAT relief, CAT screenings at least, they would under Title VIII have to provide these protections. I think the key is that the later statute applies if there's a conflict, but you don't need to get to that conflict, as your honors have been pointing out, because it can be harmonized. And I just want to raise one nuance point about what may be a nuance about the harmonization. We think that the first step in harmonizing, as the Brown and Williams case lays out, and as the much more recent case in Epic lays out, is you try and construe the two statutes not to have a conflict. If that doesn't work, you then go to the specific versus general CAT. So I want to start with trying to harmonize the laws. I think what's clear is that Congress, in enacting the asylum laws, does not have a carve out for communicable diseases. Congress has repeatedly amended the asylum laws, repeatedly created additional exemptions every few years, but has never put in an exception for communicable diseases or pandemics. And that's consistent with the Refugee Convention, which we're bound by, and is again laid out by UNHCR. There is no exception in the Refugee Convention for pandemics or communicable diseases. And that's because what the nations of the world decided was you can deal with those with mitigation, but you're not to send someone back to danger because of a communicable disease. And so I think that what we have are settled asylum laws. And so to the extent you can harmonize the two laws not to conflict, the law that's not settled in its interpretation, that's never been interpreted, is 265. And 265, we have multiple reasons why we don't believe 265 conflicts, because we don't believe it allows for expulsions, because we don't believe it applies to only transportation providers. But ultimately, I think you would have to read a lot into 265 to override the balance Congress has struck with these protective statutes. Just to make sure I'm understanding this part of your argument. So let's suppose, and I know you're going to disagree with the premise, but let's just suppose to get down to the nub of it on this axis of the argument that we disagree with you on expulsion and we disagree with you on third party slash transportation. So we're only talking about the interrelationship between 265 and the Title VIII entitlements. And as to that, I'm not understanding how it's a harmonization to say that the Title VIII provisions should be given effect in the face of 265 any more than I understand why it's a harmonization to say the opposite. It just seems like at the end of the day, one of them is going to be viewed as a carve out to the other. Under your argument, it's that Title VIII is a carve out to what otherwise exists under 265. Under the government's argument, it's that 265 is a carve out from what otherwise exists under Title VIII. So it's not a harmonization. It's just a decision that one of the statutory regimes is going to govern in the face of the otherwise applicable other one. Sure, Your Honor. So I think ultimately, if you got to the point where there's an irreconcilable conflict, then ultimately you would apply the later enacted statutes. That's sort of black letter law. But as to the harmonization point, I think what you would be saying is 265, on the assumption it applies to individuals, not just transportation providers, and allows for expulsion, still should be understood in light of the later statutes to have Congress's policy decision to not send people back to work. To send people back to danger. And I think that's what Brown and Williamson teaches, is you had an earlier statute construed in light of later statutes and policy directives from Congress in later statutes. And so the Supreme Court went back and construed the earlier statute in light of those later enactments. And I think that's what we're saying here. On the premise of your question, it applies to individuals and allows expulsion, but it doesn't mean it needs to be interpreted inconsistently with later enactments from Congress in the asylum laws. Because I think it's very clear that Congress did not want people sent back because of communicable diseases. And the charming Betsy canon obviously comes in here, where you have the international laws being very clear. And UNHCR rarely submits an amicus brief, much less takes a position on a very specific policy in one country. But they have here to point out that the Refugee Convention does not allow for communicable disease exception. And I would just note, just as a practical matter, with the exception of Hungary, every European Union country now has the exception of allowing people to apply for asylum. There's been, you know, some differences in how they do it, but ultimately only Hungary is not allowing people to apply for asylum. Can I ask a question about whether these can be harmonized? Section 265 discusses communicable diseases, but it has the additional language that there is a serious danger of the introduction of such disease into the United States. Is it true that that clause, there is serious danger of the introduction of such disease into the United States, does not appear in any of the Title VIII provisions? In the asylum provisions, it does not, Your Honor. What the asylum laws and the withholding laws set out are various exceptions. A good many of them have to do with criminal convictions. In asylum, it has to do with when you apply. There's various exceptions that Congress has repeatedly enacted different exemptions, but they have never put in a communicable disease exception. And I think that's I guess my question then is, can you, if our duty is to try to harmonize these, then isn't that the answer as to how you can harmonize 265 with the Title VIII? Is that Title VIII, Congress meant, well, we're not going to deny asylum to people with communicable diseases, so long as there is no serious danger of them introducing such disease into the United States. But if the Surgeon General makes that finding under 265, then the person with the communicable disease will be treated differently. Isn't that the answer as to how you harmonize these? Sure, Your Honor. I don't think that's the way we would view it, obviously, because we think that Congress, in refusing to make an exception for communicable diseases, even if you actually had a communicable disease, would have put something in. And I think the reason they didn't is because they're following international law. And if you were to reconcile the two statutes that way, you would then be creating an inconsistency between domestic law and international law. And as the charming Betsy Cannon suggests, that is something that the court should try and avoid. And so I think what you have are the domestic laws specifically based on our treaty obligations. And those treaty obligations are very clear that there is no exception, even for a pandemic, and that once you have that, the domestic law should be consistent. And I think there's nothing in 265 that's clear enough to say, yes, this overrides the later statutes. I think to the extent you can harmonize it, you have a statute that's never been interpreted. And to go to your earlier point, Judge Wilkins, it's absolutely unprecedented to be used against individuals. And contrary to my friend's explanation of the 1929, that was only against ships. I think you could look at the public health historian's brief to see that it was only against ships. So this is the first time in more than 100 years of its enactment, since 1893, that it's ever been used. So you have a statute that's never been used this way, has no definitive interpretation, does not have language making it clear that you should override Congress's policy judgments later on. And so you have those policy judgments that are very clear, codified in the statute, based on our treaty obligations. Congress very easily could have put in an exception. But are you telling me that it would violate international law if there were a disease with 90% or more lethality, like some of the Ebola strains, that was very communicable as a virus, airborne, and there was no cure, no vaccine, no effective treatment for it, that it would violate international law for the United States or any other country to bar persons from entering and expel them, even if they had a valid asylum claim, if that country made a determination in its technical, scientific, medical judgment that there was no safe way to kind of quarantine that person, that it would violate international law to expel that person? Your Honor, so certainly your hypothetical puts this into sharp relief, but it is the position of UNHCR that there can be no exception. Now, I want to make clear, and this also is a takeaway, maybe the biggest takeaway from the Supreme Court's decisions that you referenced earlier, is ultimately Congress could decide to change the law and pull us out of the treaty or make a reservation about that aspect of the treaty. But right now, under international law, there is no exception. And I think, you know, you look at the European Union countries, they've all managed to do this. I think, you know, your hypothetical, it does put this position to the test for UNHCR, but I think this is the position that international law has taken because the commitment to asylum is so solemn and, you know, for the U.S. after World War II, it has been so solemn. I think in this case, going to the equities, I think there's no reason why you would need to expel asylum seekers. And I just want to say a couple of points. One, I'm sorry, Judge Wilkinson. No, go ahead. I think two points, one raised by Chief Judge Srinivasan and the other by Judge Walker. Judge Srinivasan's point about really it's all about Congress settings and UCs, I want to address that. And I also want to come to Judge Walker's point about what is going on here with CDC, and I think they're related. We are not contesting, and I think this is critical, we are not contesting CDC's expert judgment. I think it is absolutely clear from CDC's August 2nd order what they are doing, the line they are, the needle they're threading, and our experts also pointing this out. What CDC is saying is, look, the whole country is open. Unaccompanied minors are processed in the exact same Congress setting, and sometimes even longer. It varies how long they spend, and sometimes the numbers are exactly the same going to your earlier question, Chief Judge. In November, for example, of this year, the numbers were the same between how many expulsions of families there were and how many UCs had to be, unaccompanied minors, sorry, had to be processed. And, you know, again, as Judge Walker pointed out, there has not been an affidavit by CDC. There's no administrative record, but of course CDC was free to put in an affidavit. Everybody under the sun for the government put in an affidavit, except CDC. And you also, this is mentioned in the amicus briefs, because it was supposed to be our briefs, but second in command of CDC, Ann Schuchard recently came out and testified before the House that there's never been a public health justification for this. She's since resigned. And I want to get to the point about UCs, because I think that's critical. It's all about Congress settings. The whole country is open, even our basketball arenas, one third of NBA arenas do not require testing or vaccines. CDC has not said you shouldn't ride Amtrak, airlines, domestic, all different sorts of Congress settings are open. The government says, well, this Congress setting is different. Unaccompanied minors are processed in the exact same place. In the July order with unaccompanied minors, it mentions that unaccompanied minors were spending 131 hours. Still, they signed off, CDC signed off on the exemption for them. And there's really no difference. Once you get out of that setting, then it's for all the reasons Chief Judge Shinervasa pointed out, Judge Walker, then those people are just the same as anybody else. And they represented 0.1 of the traffic over Mexico, 0.01% of the traffic from Mexico. And that was even before they've opened the country up to non-essential traffic over Mexico. But isn't this all part of an arbitrary and capricious argument that's not before us? Every time we point out the mitigation steps that CDC has suggested, they say, well, that would not fully eliminate the risk or eliminate the risk. But of course, that can't be the standard as CDC has pointed out. It's not the standard for unaccompanied minors. It's whether it's an acceptable risk, whether it's a significant risk, a serious risk. And I think that's really what's happening here is that this is getting caught up in a debate about immigration, but it can't be that these asylum seekers are presenting more of a risk. And I think that's why Dr. Fauci came out and said, look, I'm not responsible for Title 42. I don't know everything about it. I think the likelihood of success on the Merits Council, I mean, just common sense introduced has to include expelled. I mean, if a parent tells children living in the house, you're not allowed to introduce drugs into this house. And they, you know, search the kid's bedroom and find drugs. You're not going to tell me with a straight face that the parent couldn't throw the drugs away. But the parent somehow has to quarantine the drugs because introduced doesn't mean expelled. Right. So, Your Honor, as a parent, I'm going to definitely agree with you that I could throw the drugs away. But I think it's different here for a few reasons. And I don't want to spend too much time. I want to answer your question as directly as I can. But ultimately agree that the narrowest way to do this is to reconcile with the asylums. But on your expulsion point, I think a few things where someone's liberty is at stake. There's never been a statute that allows someone's body to be taken and moved from the country without a clear statement, whether that's immigration or extradition. The other point I would make is that the government concedes, and I think everyone concedes, that this applies to US citizens. So what you would be having is Congress implicitly, implicitly saying we can summarily expel US citizens. That would have been a big thing for Congress to do. But that's not before us. All that's before us is this order. This order doesn't say anything about US citizens. It explicitly excludes US citizens. Well, I think, Your Honor, you would have to bring that into bear for the reasons that the Supreme Court has laid out in the Zavidas case, in the Clark case, and interpreting a statute. Whether the litigants who raised the constitutional problem were actually before you, you want to take that into account in interpreting the statute. I think the other thing the Supreme Court has said is where it's so unprecedented, you ought to bring a skeptical eye to this. But ultimately, Your Honor, I recognize that the court may be not ready to go to that argument on the merits, and so on the asylum question, that's a much more narrow issue. Before we go to asylum, let me just ask one follow-up question on the theory that's most clearly before us, which is the one that the district court adopted and that you're defending. What is the implication of that theory for whether the plaintiffs have committed a crime? Because as I understand it, that theory would mean that there's been an introduction. And under the way you see the case, and I think your brief spells this out, there's an alternate avenue of enforcement that's available to the government, which is criminal prosecution under 371 – 271 rather, sorry. So does that mean that for this part of the case that the plaintiff's class is subject to criminal punishment? They are, Your Honor, and I think that's one of the reasons why there are enforcement mechanisms. There are heavy civil penalties, there are criminal penalties, there's quarantine, and ultimately they can be removed under immigration laws. And this, I think, scopes over all our arguments. And does the commission of a crime not affect the entitlement to any of the relief under Title VIII? It does not, Your Honor. It has to be a more serious penalty. I would also note that even without 265, it is illegal to cross between ports of entry. That's 8 U.S.C. 1325. It's a misdemeanor. But the one thing Congress made clear is whether or not you cross between a port of entry, you can still apply for asylum. So for the government to suggest, well, they have no right to be here, therefore, it's absolutely not true. That's 8 U.S.C. 1158. The Ninth Circuit in the East Bay case said it doesn't matter that people cross between ports illegally. They have a right to apply for asylum. That was Judge Bybee's decision that ultimately the government asked the Supreme Court to stay and the Supreme Court refused to. So what I think there are are there are a lot of deterrents. There are penalties. It's not as if you can't do anything. And you ultimately can expel them, the immigration laws. And I want to be clear about how quick that is, because I think the government is suggesting a huge gulf in the time period. The expedited removal statute was enacted in 1996. What Congress thought was we need a swift way to remove people right at the border, people who are covered by the CDC order, in effect. And so Congress said, we're going to allow expedited removal. If you're not applying for asylum, that can be a matter of minutes. A supervisor just has to sign off. They have to ask you, do you want to apply for asylum? If no, the supervisor signs off, you're gone, right out of the country. If you want to apply for asylum, you can, but it's a very quick timetable that under the regulations can last about a week. And on that, Congress, again, was very clear. You still have to be allowed to apply for asylum, even if this expedited removal process is going to be applied to you. And again, but no exceptions for communicable diseases. So I think it's much quicker. And so I take Judge Wilkins' hypothetical, and it's a fair one, but I think there are ways to deal with it. Ultimately, Congress can change it. But I think international law takes the idea that people running for their lives have to be allowed to apply. There have to be mitigation steps taken. If we ever get to a disease where there are literally no way to handle it, I am sure Congress will react to that. I guess the question is whether 265 already did that and forecast that possibility and left it up to the CDC director, at that time the Surgeon General, I guess, but the CDC director, as to whether we're in that situation now. And as to that, I take the point that under the existing laws under Title VIII, Congress has already struck a balance between somebody who has a communicable disease and whether they're nonetheless entitled to apply for asylum. That balance has been struck. And I also take the point that because having a communicable disease is a ground for inadmissibility, then we're already talking about people who at least pose some danger to the United States, because otherwise, why make it a ground of inadmissibility if they're not going to pose a danger to the United States in the first place? I guess that's the reason the communicable disease is a problem, because it could be introduced. But as Jeff Wilkins points out, 265 talks about serious danger. And the argument that the government makes is that it's only a narrow emergency situation in which you have the serious danger. And Congress hasn't yet struck that balance. 265 does that. 265 says in this narrow, necessarily, historically, almost unprecedented circumstances in which this kind of authority can be asserted, Congress did strike the balance and say that 265 governs, even if in non-emergency situations, the entitlement to asylum would overcome somebody who has a communicable disease. Sure, Your Honor. So I think what we have then is a statute in 1893 that's not specific to asylum and protection of what it might overcome. So there's no sort of clear statement in the statute. And I think that's sort of like Brown and Williamson. You have a statute that's not been definitively interpreted. And you then get later statutes where Congress is making clear what they think about the very specific issue. And I think that's the asylum laws. So I don't think you're foreclosed from interpreting 265 to say, well, there's going to be an exception, because I don't think 265 directly addressed it. I want to take a step back, because even if it goes more to our first two arguments, that there's no expulsion, only applies to transportation providers, I do think some of the historical context is worth emphasizing. It may seem implausible in today's day that Congress would have only regulated transportation providers or not put in an expulsion for individuals. The reason is because two things were markedly different back in 1893. The first was the immigration landscape. As the legislative history points out, 95% of immigrants came just to the New York Harbor. And that doesn't include Boston and San Francisco Harbor. So virtually all immigrants came by ship to the harbor. So there was very little land migration. Secondly, the federal government really wasn't involved in the public health sphere. They were just tipping their toe in 1893, but they were relying on the states. And the historian's brief lays this out, because the states could criminalize, they even expel people. And the federal government couldn't practically actually enforce the border. They did not have agents along the border. The states did that. So for the Congress looking at this, they would have said, well, there's very few people coming at land. We don't have agents along the border. We're going to leave that to the states. So I think what's happening is the government is suggesting, well, it couldn't be that they wouldn't regulate individuals back in 1893. But the fact is, again, as the historian's brief lays out, that's what they were doing, because that was the landscape. But even if you don't accept either of those two arguments, I think there's nothing in that statute that says you can't reconcile it with very clear pronouncements by Congress later on. What about the language that says suspension of the right to introduce? Because if we're past the transportation part, I take it – I know that you have the response that what that was about was licenses. But for purposes of this part of the argument, we're already past that. Then the suspension of the right to introduce, it could be that the right to introduce is the sort of thing that asylum covers, and what 265 contemplates is suspension of that kind of right. Sure, Your Honor, and that is the government's argument. I think what we believe is that that's not sufficiently clear language, and it was in a dependent clause. And I think, as Your Honor just pointed out, it's most naturally read to suspend the license of a shipping company. And I think what it goes to is the larger point of, is there anything in 265 that is so clear that it's going to allow the CDC director to wipe away all our asylum laws, withholding laws, cat laws? That really is an enormous change to the landscape, but I know the major questions issue that's raised in the Cato brief has been used with economic questions. But I think to wipe away all of the U.S.'s protection statutes in violation of international law would be an enormous step, and I think there's nothing that suggests you cannot reconcile 265. And it would be very different, I think, I don't know that the legal question would be different, but I think we might be in a different conversation if there was really no way to mitigate. And one thing I want to mention about what my friend said, my friend said, well, we really want to do this, we're working at it. And I think that was a fine response the first month, second month, third month, but we're two years into this and we're six months from CDC saying, you can do this. Here's the roadmap. You've done it for unaccompanied minors, or at least HHS has done it for unaccompanied minors, put up 14 new emergency shelters in only two months, 20,000 new beds, here's the roadmap for you to do it. And so I think what Judge Sullivan, just bringing a common sense approach to it, said is, look, at some point, this is just a matter of allocating resources. CDC is giving you a roadmap how to do this. It's been a long time. It seems like DHS needs a little bit of a push. There's something going on here that can't be strictly about public health. Because as Judge Walker pointed out, when you start, and Chief Judge Srinivasan pointed out, when you start comparing the various groups, it's clear that these asylum seekers don't prevent such a different risk. So we are not taking issue with CDC. We are simply saying, at some point, DHS needs to comply with CDC. And it's been a long, long time now. And we, as your honors know, we put this case on hold. But how are we supposed to look at that? I mean, either the statute, we're to decide whether the statute gives the government the authority to do this or not. We're assessing whether the statute gives them this authority. So what are we supposed to do with that argument that you made? Sure, your honor. And I apologize if I was conflating two different parts of our case. But I was simply going to the, I moved without much of a transition, I apologize for that, moving to the equities arguments. Simply saying, I think that they can reconcile with the asylum withholding and CATS statutes, and I don't think it raises the specter. Going to the balance of harms, it raises the specter that your honors hypothetical presented, because I do think, and you know, if anything like that ever came about, it may be that they don't have the power to do it, but the injunction wouldn't be proper. You can deal with that at the equities. But ultimately, I think if something catastrophic like that ever did happen, where there were literally no vaccine mitigation steps, I think that's probably where Congress steps in and says, we're bowing out of the treaty, or maybe even the international community says, we need to adjust. I was simply going to the equities. And I think there's absolutely no question that the theme here is that the government's brief is treating asylum seekers very differently. All the mitigation steps that have been recommended by everyone are not enough, according to the government, because they don't fully eliminate. And again, CDC has repeatedly said it cannot be a zero risk. They're letting people who go to basketball games, fly on planes, Amtrak, unaccompanied minors. The other thing I would make as a point of comparison is, in litigation over ICE facilities, where people are being detained long term, the government has repeatedly said in every brief, we don't have to eliminate all risks, just have to make it acceptable. And mitigation steps are sufficient, like testing and various things. So I think even there, the government has made it clear, there is absolutely no way there could be zero risk. And so they're applying a different standard. I think that's not dissimilar to the contradictions that Judge Walker pointed out with the MPP briefing about individual harms. And I want to just turn for one second to the individual harms. I don't need to dwell on it. I think Judge Walker laid them out carefully. But it's literally like the families are walking a plank, and the U.S. government knows it. The U.S. government's pushing them over the bridge, as they walk over the bridge, the cartels are sitting there waiting for them. Mothers and fathers are holding their little kids' hands, knowing that the cartels are at the other end. In some regions, between 20 and 40 percent of the families are being targeted for kidnapping. And then after the kidnapping, the most brutal treatment, sexual assault, mothers being assaulted in front of their kids. And so for the government to say, well, the transmission risks for this one group outweigh all those harms, I don't think is plausible. And I think Judge Sullivan was right to find that the balance of equities favors us. But again— What's your response to the government's argument that this case is not really like the OSHA reg, that it's really more like the Medicaid reg? Yeah, I think, Your Honor, that what the Supreme Court said in the Medicare is, the law was very specific, that they had done all these types of things, protect from infection, and answered a question's argument that—sorry, the company's arguments at oral argument—that they could do various measures, make them wear gloves. So it was just a matter of degree, I think. And the statute was much clearer. I think this is closer to OSHA, where it was unprecedented this time. And this is really night and day from regulating ships. In 1893, we have gone through a number of pandemics, including the Spanish flu and meningitis. They have never used it to expel people. And so the other thing I would—and with all due respect to my friend on the other side—the government's letter said, well, this is only non-citizens and certain group of non-citizens being expelled. It's not economic impact on Americans. I would submit that. I'm not—I don't want to minimize any of the economic impact, but I would submit that the harm here is equally great. And what the Supreme Court—to the extent there's a takeaway in all the Supreme Court cases, and I think there is, it's you can't factor in the dangers of COVID in interpreting the statute. You need to find that very specific statute or authority, and you want to be very skeptical if it's never been used before. And this statute goes way back, obviously, before the OSHA statute. This statute goes back to 1893. And again, I would urge the court to look at the historians. The balance of equities, I can imagine two very different responses, different from each other. But that would be responses to your argument on the equities. One is an argument, and I'm neither endorsing nor criticizing either of these arguments. One is an argument that we've heard that you'll ultimately have a better humanitarian situation with fewer people taking great risks to cross the border if the government makes it extremely painful on them when they are apprehended. So that's one. I'd like to respond to the other one as well. It's very different. We heard in the vaccine or argument Justice Breyer asked on multiple occasions a question along these lines. He would say to the challengers, I'll assume your argument is reasonable. I'll assume the government's argument is reasonable, rather than exactly trying to figure out, you know, which is better. There have been, he mentioned the statistic of 750,000 new COVID cases yesterday, he said. He said, I mean, there were three quarters of a million new cases yesterday, new cases, nearly three quarters, seven and some odd thousand, okay? And he said, the hospitals are today, yesterday, full, almost to the point of the maximum you'd ever see in this disease, okay? And he said, are you telling me that when I consider the state factors or when this court considers preliminary injunction factors, that that really shouldn't just be the end of the case? COVID is prevalent. The government is trying to protect people from COVID. And we ought to just, when we balance equities, you know, just do whatever the government and the CDC say. Sure, Your Honor. Maybe take those in the order you gave them to me. One is on the deterrence. And I think that goes to a point that Chief Judge Srinivasan asked, which is, isn't really what's going on here in light of the lack of a CDC affidavit and other indications that this is being used as an immigration statute. People can debate whether the border policy is working and the asylum policy is working, but ultimately this can't be used as an immigration provision to deter people. And I think that relates to your second point and what other people are coming over. One point I neglected to mention is that at one point the government was safely doing 70,000 families, processing 70,000 families. They're only doing 30,000 families now. So it's absolutely clear they can do more. But as to Justice Breyer's point, I mean, obviously he was in dissent in one of the cases, but putting that aside, I think it goes to, there they were simply asking, can we force mitigation steps? Here we're saying, even with mitigation steps, we want to actually expel you. And so all we're saying is that the mitigation steps are sufficient to make family asylum seekers the same as all the other groups who are being allowed to do stuff. I think CDC is saying, yes, go to a basketball game, 15,000 people, as long as, you know, we urge you to vaccinate, we urge you to wear a mask, but the arenas are not requiring that. In many, many college arenas, one third of the FDA. CDC is not saying don't ride Amtrak, don't go on planes. And so I think ultimately that's what's going on here is that we can't have a zero risk. We're never going to have a zero risk. And asylum seekers can't be singled out for worse treatment and have a zero risk applied to them, especially not where the harm is so great. But people have a choice to whether to go to the basketball game, to get on Amtrak, to get on an airplane, you know, border patrol officer who's working, you know, they have to do their job. And to the extent that they are exposed to increased risk from congregate settings from these people, they're not similarly situated to those other circumstances. They're basically kind of forced into this. And isn't that part of what this order is trying to prevent? So, sorry, a few responses. One is, I think that the government had been making that argument much more forcefully and CDC has been pointing it out much more forcefully in the very beginning. Now that there are vaccines and there's a mandate for federal employees and most CBP officers are now vaccinated. I don't think that's an argument that can be made that the border patrol is any different than other people who come into contact. The other point is that they're already coming into contact with unaccompanied minors. CDC has said that's fine. So I think ultimately they're not that much different. The people who work in the arenas, the people who work on the planes. I think once you get out of that congregate setting, then it no longer, the order can no longer be justified. And within the congregate setting, I think that's why the government and CDC have pulled back from that argument because of the vaccinations, because they're saying it's okay for unaccompanied minors to be exempted. And so we, I want to be clear, Judge Rose, we are not being cavalier. We hope we are not coming off as cavalier about COVID, but I do think the country now has moved. And I think more importantly, CDC has said, we've moved to a place where mitigation steps are the solution. And notably, not only has CDC not put an affidavit in and made that clear in its August 2nd order that mitigation steps are the way to go, but I am not aware of any real public health support for this CDC order. We've put in affidavits from former CDC officials and other public health experts saying that mitigation steps are the way to go. What's really happening is DHS is refusing to take those steps. And I know that they've said that they're trying and they want to do it. But now it's been two years and it's been six months, even since the August 2nd order. At an absolute, absolute minimum, one thing this court can do is send it back to Judge Sullivan and say, does DHS have a plan for putting these mitigation steps in place? Because right now, DHS is refusing to even say how the mitigation steps are coming along. And you see in their affidavits, for example, the Chihuly affidavit, where he says these, these Congress settings were not designed for this. Well, that's all well and good that they weren't designed, but now it's been two years to change them. I mean, it can't be that hard to build outdoor processing, and yet they haven't done that. The NGOs are saying we have more capacity. We'll help you. And ultimately, the government, no, this is not asking the government to reverse gravity. They know how to do this because they've done it and safely processed at the time of the order, 86% of the families. We were talking about another 8,000 families. That represents the 14%. That's 267 a day. That's half a plane load coming for the entire southern border. If we had ever said to TSA, can you process it for 267 people from a plane load in the entire U.S. And they said, well, we can't do it. We've been two years. That would be inconceivable. Right now, they're processing 30,000 people. They absolutely can do this. And again, I just, you know, stressing with Judge Sullivan, I think looking at it from a common sense standpoint said, if there's a likelihood of success on the merits, which, yes, Judge Walker, we absolutely have to show that. But if there is, ultimately, there is extraordinary harm to these families, maybe out of sight, out of mind to most of the American public, but just really gruesome harm. And DHS can do this. They're doing it for unaccompanied minors. They're doing it around the country. So ultimately, I think that's where the case comes down to. And I would urge the court to at least take the narrowest ground and reconcile with, as Brown and Williams did with the later statutes that Congress has specifically looked at this issue. Make sure my colleagues don't have additional questions for you, Mr. DeLaurentiis. Thank you. Thank you, Your Honor. Ms. Swingle will give you three minutes for rebuttal. Thank you, Your Honor. I'd like to just turn to this question where Mr. Gallant left off, which was a focus of the court's questioning earlier, which is how to best harmonize what seems to be his primary argument today, how to harmonize Section 265 and international treaties providing a right to apply for asylum or for relief under the Convention Against Torture. So this perhaps seems self-evident, but I would note that those conventions, the Convention Against Torture and the Refugee Protocol, which is the only one that the United States is a party to, are non-self-executing treaties. They are non-self-executing treaties that Congress then implemented into domestic law. And so I think it is extremely odd to invoke the charming Betsy principle to try and harmonize the statutes. I think the question is, what did Congress intend? And so the best evidence, I think, of what Congress intended is to put those statutes side by side. And when we look at Section 265, I think there are multiple indicia that Congress intended for it to displace and be the more specific rule of decision in contradistinction to the immigration laws. First, I think as Judge Wilkins pointed out, it applies only where there is a determination of a serious danger of the introduction of a communicable disease from a foreign country into the United States. We know from the title of the section when it was originally enacted, it was entitled Suspension of Immigration During Existence of Contagious Diseases. We can look to see that the President was originally given the authority to invoke authority under this section. It was considered so significant a power to be invoked that unlike the other provisions of the 1893 Act, which were invoked at the authority of the Secretary of Treasury or of various health officials, this was the President alone who had the power. And it's notable that even in the current version of 265, the Surgeon General, now the CDC, has to act in accordance with regulations approved by the President, which I think is reflective of the significant nature of the decision being made under this provision. And then I think we can look to, as we've noted, that the determination is that a suspension of the right to introduce persons is necessary to protect the public health. And that was intended to confer the authority to suspend immigration, which I think necessarily envisions suspension of what would be the otherwise applicable immigration laws. And even today, the section is entitled Suspension of Entries from Designated Places. And so I think together that all manifests a pretty clear congressional intent that this statute should take precedence in the extraordinary circumstances in which it is necessary to invoke this authority. And I just want to, one final point. It is true that the only time that the President has previously invoked Section 265 to suspend entry, it related to entry from foreign countries. But I think that tells you very little about what the outer scope of the authority is. Obviously, in 1929, when you're talking about passengers coming from China and the Philippines to the United States, it would not be surprising that they would be traveling by vessel. But I would also note that the actual suspension order was not, by its terms, so limited, and it referred to introduction directly or indirectly and by transshipment or otherwise. Thank you, counsel. If my colleagues don't have additional questions for you, thank you to you. Thank you to both counsel for your arguments this morning. We will take this case under submission.
judges: Srinivasan, Wilkins, Walker